IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VICTOR ANTHONY ORTEGA,

                Petitioner,

vs.

M. ELIOT SPEARMAN, Warden, High
Desert State Prison,[1]

                Respondent.

No. 2:13-cv-01913-JKS

MEMORANDUM DECISION

      Victor Anthony Ortega, a state prisoner represented by counsel during briefing but now

proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28

U.S.C. § 2254. Ortega is in the custody of the California Department of Corrections and

Rehabilitation and incarcerated at High Desert State Prison. Respondent has answered, and

Ortega has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

      On April 1, 2010, Ortega was charged with the malice aforethought murder of Marcus

Mayes (Count 1) and the malice aforethought attempted murder of Dariece Sims (Count 2), both

of which were serious and violent felonies. The information further alleged as to Count 1 that

Ortega used and intentionally and personally discharged a firearm thereby causing great bodily

injury or death to Mayes, and that he used and intentionally discharged a firearm with respect to

Count 2. Both counts also alleged that he personally used a firearm, which also caused them to

be serious and violent felonies. On March 25, 2010, Ortega proceeded to a jury trial. On direct

---

[1]     M. Eliot Spearman is substituted for Connie Gipson as Warden, High Desert State
Prison. Fed. R. Civ. P. 25(d).

appeal of his conviction, the California Court of Appeal laid out the following facts underlying

this case and the evidence presented at trial:

On May 28, 2008, around dusk, the victim, Marcus Mayes, and his friend Dariece Sims walked down a street. [Ortega] drove past them, going in the opposite direction. As the car passed, the passenger, who was reclined in his seat, leaned up and quickly glanced at Mayes and Sims while trying to hide his face. This piqued Sims's curiosity and spooked him. Sims asked Mayes if he had seen the car. Mayes looked back at Sims but did not otherwise respond as they continued walking.

After the car went down the street, it evidently made a U-turn and headed back in the direction in which Mayes and Sims were walking. The car slowly passed them and drove out of sight behind a fence and a bend in the road. As the car passed, [Ortega] and the passenger were "mad-dogging" Mayes and Sims. Sims described the term "mad-dogging" as "[l]ooking hard, like staring at somebody for a long time." Sims got suspicious and asked Mayes, "Did you see them?" Mayes replied, "Yeah, I saw them. Just keep walking." Sims did not recognize [Ortega] or the passenger.

Mayes and Sims kept walking. When they rounded the bend in the road, they saw that the car had parked facing toward them, as if it had made another U-turn in the interim.

[Ortega] and the passenger left the car and walked toward Mayes and Sims, who continued walking toward them as the distance quickly closed. When [Ortega] and the passenger were about six feet from Mayes and Sims, everyone stopped walking. The passenger asked [Ortega], "[d]on't you know him?" and [Ortega] replied, " [y]eah, that's the bitch-ass nigger from the Light Rail."[FN2] Sims believed there was going to be a fight.

FN2. Sims told a detective that they had not gone to the light rail station and had remained in the neighborhood all day.

[Ortega] drew a revolver from his jacket pocket as he finished his remark. Mayes, who was two or three steps in front of Sims, swung at [Ortega] but missed, which threw him off balance. Mayes grabbed the front of [Ortega's] jacket with both hands and pushed him into a gate and fence. [Ortega] and Mayes were upright at that point. [Ortega] had both hands up by his head with the gun in his left hand "pointing up in the air."

Sims rushed at [Ortega] and tried to grab the gun. He fought for the gun for three to five seconds. As soon as Sims felt the gun, it fired, burning his hand. Sims heard the loud shot go past him; he felt heat on his hand and his shoulder. The heat caused him to let go of the gun. It was later discovered that Sims's coat had two bullet holes, one in the top right shoulder, which appeared to be an entry hole, and the second in the back of the right shoulder, which appeared to be an exit hole.

At the time the first shot was fired, [Ortega], Mayes and Sims were all standing upright. After the first shot was fired, Sims looked at the gun, turned around and dropped to the ground for protection. Sims could not see anything. At that point, he did not know

what Mayes, [Ortega] and the other person who had confronted them were doing. Prior to that point, the other person had not been doing anything aside from standing.

After falling to the ground, Sims grabbed for Mayes's shirt and tried to pull him down. Sims heard three more shots as he tried to pull Mayes to the ground, but he did not see what position Mayes was in at that time.

After the shooting stopped, Sims looked up and saw [Ortega] and the passenger run off. The duo ran to the car, got inside, backed up and drove away.

Mayes hit the ground right next to Sims but hopped right back up. Sims tried to grab Mayes. Mayes took about five steps and fell. Sims talked to Mayes, but Mayes did not respond. Sims, who was hysterical and yelling, stayed with Mayes until the police arrived.

Five citizen witnesses testified at trial. Joanne Parker, who lived in the area, heard two gunshots back to back. She looked out the window of her home and saw two males run and get into a car that sped off, made a U-turn, and drove away.

Karen Johnston, who also lived in the area, heard what she thought was a car backfiring. She went out to her backyard and determined that she had heard gunfire—five shots in quick succession. Johnston looked over her fence, heard one man screaming and saw a second man running to a car as she heard someone yell "[g]o, go, go." The second man entered the car on the driver's side. Then the car, with the two occupants, backed up and drove away.

Sandra Swift, who also lived in the area, was watching a movie on her television when she heard a pop that she thought was a gunshot. A "few seconds" later, she heard three more shots. From her window, she saw two men hurriedly run down the street and jump into a car. The car made a U-turn and sped off.

Harold Fulkerson was standing in a parking lot approximately 200 yards away from the shooting scene. He heard "five or six gunshots" in rapid succession "about as fast as [someone could] pull the trigger." He estimated that all of the shots were fired within a span of approximately three seconds. Because of his distance from the scene, he could not see the shooting or see or hear anything that had occurred prior to or after the shooting.

Diane Barber was driving her car and stopped at a stop sign at a nearby intersection. From a distance of 30 to 40 feet, she saw four males walking in two pairs and heading toward each other. It looked as if one or two words were exchanged, but she could not hear what was said. "[T]he victim" threw a punch, but she did not know whether he made contact. A scuffle ensued. The person accompanying the victim was trying to help him fight the others. To Barber, it seemed as if all four males began fighting. Ten seconds or less after she first observed the males, Barber heard at least two to three gunshots in very quick sequence. Barber thought all four men were upright when the shots were fired. She "gassed [it]"—pressed her gas pedal—and drove away. At that time, it appeared to her that all four men were "going to the ground." She had no idea who had fired the gun.

Dr. Mark Super, chief forensic pathologist for the Sacramento County Coroner's Office, performed the autopsy on Mayes and testified as an expert regarding autopsy results and findings. Mayes sustained gunshot wounds to the right arm, right shoulder

and right hip.  He also had abrasions on both knees, on his left palm, and above his temple, which had occurred at or about the time he received the other injuries and which could have occurred around the time of his death or hours before.  Mayes also had abrasions around the knuckles of his right hand.  Dr. Super opined that the abrasions to Mayes's knees were "fairly characteristic of somebody just falling down on their knees," and the abrasions to his knuckles were consistent with Mayes putting out his hand during the fall.  Dr. Super opined that the abrasion to Mayes's head was the result of his head impacting a broad surface such as the ground or a wall or something like that.  The abrasions were also consistent with Mayes having been involved in a physical altercation, but Dr. Super opined that bruising to the hand is more common than abrasions to the hand in that scenario, and Mayes did not sustain any bruising.

The bullet that struck Mayes's right arm entered his forearm on the pinky finger side below the elbow, traveled in a straight line anatomically upward into his upper arm, and exited near his right armpit.  Dr. Super opined that, given the bullet's path, Mayes's arm had to have been away from his body and his elbow had to have been bent somewhat backward, as if throwing a ball.  Otherwise, the bullet would have entered his chest.

The gunshot wound to Mayes's right hip entered from the outside of his hip and exited on the inside of his right hip, traveling on a downward and slightly back-to-front path.

The gunshot wound to Mayes's right shoulder was fatal.  It entered at the top of Mayes's shoulder close to the base of his neck and traveled anatomically straight down in a direction toward his feet.  The bullet path was from right to left, not significantly frontward or backward.  The bullet traveled behind his collarbone, struck his right lung, traveled through his heart, passed between two ribs, and came to rest in the front left portion of his chest.  The bullet path indicated that the muzzle of the gun was anatomically above Mayes when the shoulder wound was inflicted.

Dr. Super opined that the gunshot wound to Mayes's shoulder was consistent either with Mayes having been bent forward and the shooter firing horizontally into Mayes's shoulder or the shooter being above Mayes.  However, he acknowledged that he could not determine the sequence in which the gunshot wounds were inflicted, Mayes's exact position during any of the shots, or the time lapse involved in the shots.  He agreed there was "[e]ssentially" "an endless combination" of possible positions of Mayes's body and the gun, and offered as an example that Mayes could have been hanging upside down while the shooter fired upward.

Dr. Super was asked about the proximity of the muzzle to Mayes in connection with only one of the three gunshot wounds—the wound to Mayes's hip.  Dr. Super said there was nothing around that entrance wound to indicate whether it was or was not a close-range wound.  He characterized the wound as being of "indeterminate[ ]range."[FN3]

> FN3.   A jacket with DNA on the collar that could have come from [Ortega] or
>         from one out of 110 Hispanics selected at random, also had a sleeve
>         stained with blood that matched Mayes's DNA.  [Ortega] contends this
>         evidence showed that [Ortega] and Mayes were in close proximity during

the shooting.  However, there was no testimony about the nature of these bloodstains, *i.e.*, whether they appeared to be spatter or transfer smears.

Because the fatal bullet traveled through his heart, Mayes would have collapsed 30 seconds following the infliction of the wound to his shoulder.  He would have died within several minutes of collapsing from lack of pressure.  It would have been possible for him to get off the ground and run a couple of feet before collapsing.

During closing argument, the prosecutor argued inferences that could be drawn from the evidence to establish the sequence of gunfire.  She told the jury, "So we have this first gunshot.  Maybe an accident?  Maybe?  Couple of people struggling for the gun.  I don't know.  But let's talk about the next gunshots because those are certainly no accident."

The prosecutor then went on to argue her theory of the sequence in which the three gunshot wounds were inflicted.  She argued that the first wound Mayes sustained was the one to the hip, and it was inflicted while he was standing.  The second was the wound to the forearm.  It was inflicted while Mayes was in a position lower than [Ortega] and his arm was up in a defensive position.  The final wound was the fatal gunshot to the shoulder that entered the top of Mayes's shoulder, traveled downward and penetrated his chest cavity.  The prosecutor argued that Mayes was going down to the ground or was down on the ground when the fatal bullet was fired.  Further, Mayes could not have had his own hands on the gun in a struggle for control of it when the fatal wound was inflicted.

Defense counsel argued the shooting was not intentional, deliberate or premeditated.  He argued imperfect self defense and that [Ortega] pulled the gun only to scare Mayes.  He suggested that pulling the gun's trigger was a "joint effort between the two guys grabbing the gun."  He emphasized that Dr. Super could not determine the exact sequence in which the gunshot wounds had been inflicted.

*People v. Ortega*, No. C065027, 2012 WL 1200930, at *1-4 (Cal. Ct. App. Apr. 10, 2012).

On April 8, 2010, the jury found Ortega guilty of Count 1 (malice aforethought murder of Mayes) and found true the allegations attached to it.  The jury found him not guilty of Count 2 (malice aforethought attempted murder of Sims) and its lesser included offense of attempted voluntary manslaughter.  The trial court subsequently denied probation and sentenced Ortega to a term of 25 years to life imprisonment on Count 1, plus 25 years for the firearm use finding.

Through counsel, Ortega appealed his conviction, arguing that: 1) there was insufficient evidence to sustain his Count 1 conviction; 2) the trial court failed to properly instruct on the

lesser-included offense of unlawful act involuntary manslaughter; and 3) the trial court violated

Ortega's right to counsel of his choice when it refused to allow him to discharge his retained

attorney and refused to consider a new trial motion based on ineffective assistance of counsel.

On April 10, 2012, the California Court of Appeal issued a reasoned, unpublished opinion

unanimously affirming the judgment against Ortega. *Ortega*, 2012 WL 1200930, at *11. Ortega

petitioned in the California Supreme Court for review of all three unsuccessful claims, which

was denied without comment on July 11, 2012.

Ortega next filed in the California Superior Court a *pro se* petition for habeas relief. In

that petition, he argued that trial counsel was ineffective by: 1) failing to investigate a witness

who gave a statement to police that he had been robbed by the victim two days prior to the

confrontation in Ortega's case; 2) failing to file any pre-trial motions to reduce the murder and

attempted murder charges; 3) failing to propose a voluntary manslaughter instruction; and

4) refusing to allow Ortega to testify. The superior court denied the petition in an unpublished,

reasoned opinion issued on July 27, 2011. Ortega raised the same claims in a *pro se* habeas

petition in the California Court of Appeal, which was summarily denied on September 15, 2011.

Ortega also raised the claims in a *pro se* habeas petition in the California Supreme Court, which

was denied without comment on February 29, 2012.

Ortega, represented by counsel, then filed another petition for habeas relief in the

California Supreme Court. In that petition, Ortega alleged that trial counsel was ineffective for

failing to: 1) investigate and present other expert forensic testimony on bullet trajectories and

pathology in order to explain the positions of the parties and the sequence of shots; 2) failing to

investigate the availability of forensic evidence that might raise a reasonable doubt as to

Ortega's culpability for first degree murder; and 3) "be aware that using the bullet trajectories to establish the position of the shooter and victims as well as the sequence of shots fired, or at least raising substantial doubts as to the prosecution's evidence on those points, was critical to the success of Ortega's defense." The Supreme Court denied that petition without comment on December 18, 2013.

While his second habeas petition in the California Supreme Court was pending, Ortega timely filed a counseled Petition for a Writ of Habeas Corpus to this Court on September 16, 2013. *See* 28 U.S.C. § 2244(d)(1)(A). He simultaneously moved for a stay in the federal proceedings pending exhaustion in the California Supreme Court, which was granted by a previously-assigned magistrate judge. Docket Nos. 2, 7. After the Supreme Court denied the petition, the stay was lifted. Docket No. 11. After briefing was completed, Ortega's retained counsel moved to withdraw as his attorney, which was granted. Docket Nos. 28, 30. Ortega's motions for appointment of counsel were denied without prejudice, Docket Nos. 29, 30, 32, 33, and Ortega is now appearing before this Court *pro se*.

## II. GROUNDS/CLAIMS

In his Petition before this Court, Ortega argues that: 1) there was insufficient evidence of intent to kill, deliberation, and premeditation to sustain his murder conviction; 2) the state courts unreasonably applied clearly established federal law and unreasonably determined the facts when it found harmless any error with respect to unlawful act involuntary manslaughter instructions; 3) the trial court erred in refusing to allow Ortega to discharge retained trial counsel; and 4) trial counsel was ineffective for failing to retain a forensic expert.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.      Insufficiency of the Evidence (Ground 1)

Ortega first argues that the evidence was insufficient to establish a specific intent to kill and premeditation. As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by

considering how it would have resolved any conflicts in the evidence, made the inferences, or considering the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the

10

jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Under California law, "[m]urder is the unlawful killing of a human being, . . . with malice aforethought." CAL. PENAL CODE § 187(a). First degree murder includes murder perpetrated by "any . . . kind of willful, deliberate, and premeditated killing[.]" CAL. PENAL CODE § 189. Attempted premeditated murder requires proof that: (1) the defendant had the specific intent to kill the alleged victim; (2) he committed a direct but ineffectual act toward accomplishing the intended killing; and (3) the defendant acted willfully, deliberately, and with premeditation. *See* CAL. PENAL CODE §§ 664, 187(a).

The type of evidence which courts have found sufficient to sustain a finding of premeditation and deliberation fall into three basic categories: (1) facts about how and what the defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing (i.e., planning activities); (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a motive to kill the victim; and (3) facts about the manner of the killing from which the jury could infer a preconceived design to take the victim's life. *People v.*

*Anderson*, 447 P.2d 942, 949 (Cal. 1968). These three categories of evidence are not an

exhaustive list, but "provide guidelines" for analysis. *People v. Perez*, 831 P.2d 1159, 1163

(Cal. 1992); *see also Davis v. Woodford*, 384 F.3d 628, 640 & n.3 (9th Cir. 2004) (applying

*Anderson* guidelines on federal habeas review but noting admonition of California Supreme

Court that *Anderson* did not define elements of first degree murder or definitively state

prerequisites for proving premeditation and deliberation in every case, but rather was intended

only as a framework to aid in appellate review) (citation and quotations omitted).

In support of his claim, Ortega argues that the manner of killing was ambiguous because

"the prosecutor's theory as to the order of the shots and the position of Mayes when the fatal shot

was fired was unsupported by the state's own expert as well as the only eyewitnesses." But this

argument simply points out inconsistencies in the evidence before the jury; all of the evidence he

identifies in support of his claim was before the jury for its assessment. This Court is precluded

from re-weighing the evidence. *Schlup*, 513 U.S at 330. As the Court of Appeal reasonably

concluded, "the evidence [presented at trial] supports each of the factors identified in

[*Anderson*]:

**1. Planning activity**

Two types of planning activity were shown by the evidence. First, [Ortega] deliberately sought out Mayes. After driving by Mayes in the opposite direction, [Ortega] made a U-turn and, while "mad-dogging" him, slowly drove past Mayes again. [Ortega] then drove around the bend, turned the car around, drove toward Mayes a third time, and parked. [Ortega] and his passenger got out of the car and quickly approached Mayes.

Second, as he approached Mayes, [Ortega] carried a loaded firearm in his pocket, a place where it was easily accessible. He pulled the firearm out of his pocket when he confronted Mayes. This evidence supports an inference that [Ortega] planned to use the gun.

The planning evidence supports an inference that not only did [Ortega] harbor an intent to kill, but also that his intent to kill arose before, rather than during, the shooting.

Thus, the inference of intent to kill does not turn upon which of the multiple shots was fatal.

## 2. Motive

The evidence of motive was compelling. As they drove by, [Ortega] and his passenger "mad-dogged" Mayes and Sims. When [Ortega] and the passenger confronted Mayes face to face, the passenger asked, "[d]on't you know him?" and [Ortega] answered, "[y]eah, that's that bitch-ass nigger from the Light Rail." [Ortega's] mad-dogging and subsequent remark about seeing Mayes at the light rail revealed animosity toward Mayes and suggested there had been a conflict between [Ortega] and Mayes or someone who looked like Mayes. [Ortega's] conduct and words showed a motive to kill Mayes.

## 3. Manner of killing

The number of shots fired and the location of the fatal wound evinces a specific intent to kill Mayes. The defense focuses on the prosecutor's statement that the first shot was fired accidentally and contends that the sequence of gunfire argued by the prosecution was not proved beyond a reasonable doubt. The defense further asserts that the first shot fired could have been the shot that caused Mayes's death. These arguments miss the point. As we have noted, the test we must apply is the substantial evidence test. In doing so, we review the evidence in the light most favorable to the judgment. We must presume every fact the jury could reasonably have inferred from the evidence, including the circumstantial evidence. Thus, if the circumstances reasonably justify the jury's findings, we must hold that the evidence is sufficient, even if the circumstances might also reasonably be reconciled with a contrary finding.

Applying this test, we note at the outset that the jury was not required to accept the idea that the first shot may have been fired accidentally. Indeed, the prosecutor never conceded it was fired accidentally. The prosecutor posed the question "Maybe an accident? Maybe?" She then indicated she did not know whether the first shot was fired accidentally or not and focused the jury on the subsequent gunfire, which she argued was "certainly no accident."

The jury justifiably could have rejected the idea that the first shot was fired accidentally. Since [Ortega] drew the weapon, the jury was free to infer [Ortega] had his finger on the trigger. Sims did not testify that he touched the trigger, and there is no evidence he did. Consequently, the jury justifiably could have inferred that [Ortega] fired the first shot intentionally and that he did so to make Sims remove his hand from the weapon. The jury reasonably could have inferred that the subsequent shots were intentionally fired at Mayes, the person [Ortega] and his companion confronted.

[Ortega] asserts that the forensic evidence did not establish the position of the gun relative to Mayes or Mayes's position at the time any of the shots were fired. From this, he argues that the fatal gunshot could have been inflicted during the struggle.

Dr. Super testified that he could tell the relationship of the muzzle of the gun and one part of Mayes's body, but that he could not opine with certainty Mayes's specific position when the fatal wound was inflicted. However, Dr. Super did testify that the best

use of autopsy findings is to determine possible scenarios.  He also indicated that the fatal bullet, which entered Mayes from the top of his right shoulder and traveled anatomically downward, could have been inflicted by a shooter firing horizontally at a bent-over Mayes or from above Mayes.  Inferences that either occurred are reasonable.  Mayes could have bent over after sustaining the other gunshot wounds, or after Sims pulled him to the ground, or as a result of a combination of both.  Alternatively, given the abrasions to Mayes's knees, it would also have been reasonable for the jury to infer that Mayes went to his knees after the nonfatal wounds were inflicted and was then shot by [Ortega] from above while Mayes was bent slightly forward.

Moreover, even if the first shot was fired accidentally when Sims grabbed for the gun, the jury could find that neither Mayes nor Sims continued to struggle while the succeeding shots were fired.  Rather, the jury could accept Sims's testimony that he dropped to the ground following the first shot and tried to pull Mayes to the ground with him, and infer that Mayes's ability to struggle for the gun was diminished after he sustained any of the gunshot wounds.  Regardless of whether Mayes was on the ground or going to the ground, the evidence suggested that his ability to struggle for the gun—and thereby to cause it to fire accidentally—had been compromised significantly by the time the last shot was fired.  Indeed, as the prosecutor explained, Mayes could not have been reaching for the gun at the time the gunshot wound that entered his shoulder was inflicted.  And the jury could infer from the fact [Ortega] kept firing the gun that he intended to kill Mayes.

[Ortega] places great weight on the testimony of Barber and Sims in his contention that [Ortega] and Mayes were standing at the time the fatal gunshot wound was inflicted.  Barber testified that she thought all four men were "upright" when the shooting stopped and that all went to the ground thereafter.  And, as [Ortega] also points out, Sims testified that when the first shot was fired—the shot [Ortega] contends was accidental—[Ortega] held the gun at the level of Sims's head.  Thus, [Ortega] argues, the evidence was equally consistent with a scenario in which the shots were fired as the three men struggled for the gun while standing against the fence.[FN5]

> FN5.  The record is silent as to how tall [Ortega], Mayes, and Sims were at the time of the shooting.

First we note that Sims did not testify that Mayes was standing when all of the shots were fired.  Sims testified that when he went to the ground, Mayes was still standing.  Sims tried to pull Mayes to the ground, but did not see what position Mayes was in when the other shots were fired.

Second, the contention that Mayes was standing upright when the fatal wound was inflicted ignores the forensic evidence.  As we have noted, the fatal bullet traveled anatomically straight down, from right to left, but not significantly frontward or backward.  Internally, the bullet traveled behind Mayes's collarbone, struck his right lung, passed through his heart and between two ribs, and came to rest in the front left portion of his chest.  If both men were still struggling over the gun from upright positions, the gun would have been above Mayes's shoulder and pointed downward when

14

it fired.  It was reasonable for the jury to reject such a scenario as unreasonable and it would have been reasonable for the jury to conclude that Barber was mistaken when she testified that [Ortega] and Mayes were standing while all of the shots were fired.

**4. Flight**

As our high court has noted, "'*Anderson* did not purport to establish an exhaustive list that would exclude all other types of evidence that could support a finding of premeditation and deliberation.'"  Here, there is additional evidence showing [Ortega's] mental state.  His flight from the scene by running away, getting in the car he had parked in advance and driving off supports an inference that he acted with the intent to confront Mayes, shoot him, and flee from the area.

**5. Conclusion—Sufficiency of the evidence**

Based on the foregoing, we are satisfied there was sufficient evidence from which a reasonable trier of fact could conclude that [Ortega] acted with the requisite intent to kill, deliberation, and premeditation.

*Ortega*, 2012 WL 1200930, at *5-7 (citations omitted).

Although it might have been possible to draw a different inference from the totality of the evidence, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Thus, considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, and for the reasons persuasively explained by the Court of Appeal, this Court concludes that there was sufficient evidence of premeditation and specific intent introduced at trial from which a rational trier of fact could have found beyond a reasonable doubt that Ortega was guilty of the first-degree murder of Mayes.  Ortega is therefore not entitled to relief on his insufficiency of the evidence claim.

B.     Instructional Error (Ground 2)

Ortega next contends that the trial court committed reversible error when it rejected his request for an instruction on unlawful act involuntary manslaughter as a lesser-included offense. Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw*, 546 U.S. at 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding."  *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

As an initial matter, the United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases. The Ninth Circuit, like several other federal circuits, has declined to extend *Beck* to find constitutional error

arising from the failure to instruct on a lesser included offense in a non-capital case. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."). Accordingly, the decisions of the California courts denying Ortega relief as to this claim are not contrary to United States Supreme Court authority as set forth in *Beck*.

Nevertheless, the Ninth Circuit has stated that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme Court precedent. *Solis*, 219 F.3d at 929. But as the Court of Appeal reasonably determined, any purported error in not giving the involuntary manslaughter instruction was harmless because there was no substantial or injurious influence on the jury's verdict.

As previously mentioned, a claim of jury instruction error is also reviewed under a harmless error standard on federal habeas review. *Evanchyk v. Stewart*, 340 F.3d 933, 940-41 (9th Cir. 2003). In accordance with this review, habeas relief is only available where the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice." *Brecht*, 507 U.S. at 637; *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008). The relevant question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Elofus*, 598 F.3d 1171, 1174 (9th Cir. 2010). The Supreme Court recently has clarified that *Brecht* incorporates the requirements of § 2254(d)

(AEDPA). *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015). Thus, if a state court has determined that a trial error was harmless, "a federal court may not award habeas relief under § 2254(d) unless *the harmlessness determination itself* was unreasonable." *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)) (emphasis in original).

On independent review, the Court likewise concludes that any instructional error was harmless. In light of the record of evidence, there is no reasonable basis for assuming that, had the jury been instructed on the unlawful act involuntary manslaughter theory, the verdict would have been any different, particularly given that the jury, in finding true the allegation that Ortega personally and intentionally discharged a firearm, clearly rejected any notion that Ortega discharged his gun unintentionally. *See Brecht*, 507 U.S. at 623. Likewise, as the Court of Appeal stated, the jury's "further determination that the shooting was willful, deliberate and premeditated is also inconsistent with the notion that the shooting was an unintentional accident." *Ortega*, 2012 WL 1200930, at *9. It is thus clear that the failure to instruct in this regard could not have had any adverse effect whatsoever on the jury's decision, much less the "substantial and injurious effect" required to show the error was harmful. *Brecht*, 507 U.S. at 637. Accordingly, the Court concludes that no habeas relief is warranted on this ground.

C.     Refusal to Discharge Attorney (Ground 3)

Ortega next claims that the trial court deprived him of his Sixth Amendment right to counsel when it refused to allow him to discharge his retained attorney and refused to consider a new trial based on ineffective assistance of counsel. The Court of Appeal described the following facts underlying this claim:

> On April 8, 2010, in [Ortega's] presence, the trial court set a briefing schedule
> that gave his defense counsel until April 19, 2010 to file any postconviction motions,

19

gave the prosecution until April 27, 2010 to file any response, and set judgment and sentencing for May 6, 2010.

On May 6, 2010, just prior to judgment and sentencing, this exchange occurred:

"THE COURT: All right. Before we proceed, as I understand it you wish to have a hearing per *Marsden*?[FN7]

FN7.   *People v. Marsden* (1970) 2 Cal.3d 118.

"[ORTEGA]: Yes, your Honor.

"THE COURT: All right.  What I'm going to do is I'm going to ask that the district attorney leave the courtroom.

"[DEFENSE COUNSEL]: Your Honor, I don't know if *Marsden* is appropriate. I'm retained in the case.

"THE COURT: Oh, you are retained.  I didn't know that.  *Marsden* is not appropriate.  He's retained counsel.  *Marsden* deals with counsel other than retained counsel.

"[DEFENSE COUNSEL]: Your Honor, what I can tell the Court based upon a very recent conversation I had with [Ortega] is that he chooses to seek someone to file for him a motion for new trial based on inadequacy of counsel.  [¶]  I told him I wasn't his candidate for that particular job.

"THE COURT: Well, the bottom line, there's no one here and I'm not going to stop these proceedings.  [¶]  And in terms of my evaluation of your performance, you were not below the standard of care.  You were well within the standard of care [sic ].  [¶]  You must remember that in these charges count [two], I believe the attempt, and all lessers therein, [Ortega] was acquitted.  [¶]  To tell you the truth, I thought you did a good job for him and we're going to proceed.  Let's go."

Thereafter, during the sentencing hearing, the prosecution presented a video photo album that had been prepared by Mayes's family.  Mayes's brother and mother addressed the court.  The trial court then sentenced [Ortega].

*Ortega*, 2012 WL 1200930, at *9-10.

The Sixth Amendment right to counsel encompasses two distinct rights: a right to

adequate representation and a right to choose one's own counsel.  *United States v.*

*Rivera-Corona*, 618 F.3d 976, 979 (9th Cir. 2010). The adequate-representation right applies to all defendants and "focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984). A defendant who can hire his own attorney has a different and additional right, independent and distinct from the right to effective counsel, to be represented by the attorney of his choice. *See Rivera-Corona*, 618 F.3d at 979 (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006)) (emphasis omitted). However, the right to retained counsel of one's choice is not absolute. The California Supreme Court has recognized an exception to the absolute right to discharge retained counsel where the request is untimely and, if allowed and a continuance granted, would prejudice the State. *People v. Ortiz*, 800 P.2d 547, 553 (Cal. 1990). Likewise, the United States Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (citing *Wheat v. United States*, 486 U.S. 153, 159-60 (1988)). As such, trial courts retain the discretion to "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." *Id.* In general, a defendant who can afford to hire counsel may have the counsel of his choice unless "the substitution would cause significant delay or inefficiency." *Rivera-Corona*, 618 F.3d at 979; *see also United States v. Ensign*, 491 F.3d 1109, 1115 (9th Cir. 2007).

In this case, although Ortega requested a *Marsden* hearing,[2] the court informed him that because counsel was retained, *Marsden* did not apply. A *Marsden* analysis only is appropriate

---

[2]     *People v. Marsden*, 465 P.2d 44 (Cal. 1970) (holding it was error for the trial court to deny a defendant's motion to relieve his court-appointed attorney without holding a hearing to allow the defendant to explain its grounds).

where counsel is appointed. *Ortiz*, 800 P.2d at 553. Thus, to the extent Ortega complains the court denied him a *Marsden* hearing, such claim is without merit.

The Court of Appeal concluded that the trial court did not err when it reasonably determined that the requested substitution would lead to an unjustifiable delay:

> As noted, on April 8, 2010, in [Ortega's] presence, the trial court set a briefing schedule that gave defense counsel until April 19, 2010 to file any postconviction motions and set judgment and sentencing for May 6, 2010. The April 19, 2010 deadline came and went, but no motion for a new trial was filed. On May 6, 2010, which was 17 days after the deadline had passed, and immediately prior to judgment and sentencing, [Ortega's] retained counsel informed the court that, based on a "very recent conversation" he had had with [Ortega], "[Ortega] chooses to seek someone to file for him a motion for new trial based on inadequacy of counsel." The court responded in part, "[w]ell, the bottom line, there's no one here and I'm not going to stop these proceedings." The court impliedly found that [Ortega's] motion was untimely such that it would disrupt the orderly process of justice.
> The Attorney General notes that the implied finding of untimeliness was supported by the fact that the court, its personnel, and the prosecutor were in place and ready to go forward; the prosecution had set up the video photo album, which impliedly required some preparation; and Mayes's brother and mother were present and prepared to address the court on the issue of sentencing.
> . . . [Ortega] replies that an assessment of timeliness "requires a reasonable exercise of discretion," but fails to demonstrate that the trial court's implied assessment and exercise of its discretion were unreasonable. Instead, [Ortega] faults the court for failing to ask him how long it would take for him to find replacement counsel and have counsel investigate any bases for a new trial motion. However, because no new counsel appeared at the hearing, and there was no evidence of any efforts made by [Ortega] to obtain counsel, and retained counsel never asserted that the 28 days allotted for postconviction matters had proved to be inadequate to obtain new counsel, the trial court justifiably could conclude that [Ortega] had not sought new counsel in a timely manner and that his "request for delay" was not "justifiable." There was no abuse of discretion and no Sixth Amendment violation.

*Ortega*, 2012 WL 1200930, at *10 (citations omitted).

The Court of Appeal's conclusion is both reasonable and fully supported by the record.

Ortega therefore fails to show that the Court of Appeal's rejection of his claim contravenes or unreasonably applies federal law. *See, e.g.*, *Sampley v. Att'y Gen. of No. Carolina*, 786 F.2d

610, 613 (4th Cir. 1986) (state trial court's denial of a continuance under similar circumstances did not violate the Sixth Amendment). The request was made at sentencing, which occurred several weeks after Ortega was convicted and after the deadline for filing post-conviction motions had passed. It was within the trial court's discretion to deny the motion made at sentencing where substitution would have required a continuance. *Cf. Katekeo v. Felker*, Civ. No. 08-2776, 2009 WL 805806, at *7 (E.D. Cal. Mar. 26, 2009) ("[T]he court observes that petitioner's motion for substitute counsel was made at the sentencing haring. The time of the motion suggests that it may have been more motivated by disappointment with the verdict than actual dissatisfaction with counsel."), *report and recommendation adopted by* 2009 WL 1456537 (E.D. Cal. May 22, 2009), *aff'd by* 401 F. App'x 246 (9th Cir. 2010).

The record reflects that Ortega has not raised any claim that he was denied the right to represent himself at sentencing, nor has he claimed any sentencing error. To the extent his claim is based on his inability to move for a new trial based on the ineffectiveness of trial counsel, Ortega has now been separately represented by two other attorneys and had the opportunity to raise his ineffective assistance of counsel claims before the California Court of Appeals and California Supreme Court, which rejected them.

Notably, "[i]t is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for [a substitution of attorney motion], and that the matter be resolved on the merits before the case goes forward." *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc) (remanding for evidentiary hearing where state court had failed to make any inquiry into the substance of defendant's claims alleging breakdown of petitioner's relationship with his appointed counsel, so there was no record of how far that

23

relationship had deteriorated). This inquiry is required when addressing requests to discharge or substitute retained counsel as well. *See United States v. Mitchell*, 120 F. App'x 24, 25-26 (9th Cir. 2004). Here, Ortega expressed a belief that counsel was ineffective, and the trial court addressed whether his Sixth Amendment rights were adequately protected and concluded that they were. Although the trial court's cursory treatment of Ortega's request gives this Court pause, Ortega cites to no Supreme Court authority, and this Court is not aware of any, requiring a state trial court to conduct further inquiry in such circumstances, particularly given the untimeliness of Ortega's request.[3] Ortega thus fails to demonstrate that the state court rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), and federal habeas relief is not warranted on this claim.

D.      Ineffective Assistance of Trial Counsel (Ground 4)

Finally, Ortega claims that trial counsel rendered ineffective assistance by failing to retain and present the testimony of a forensics expert. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

---

[3]      The trial court's treatment of Ortega's desire to hire new counsel to pursue ineffective assistance of counsel is somewhat ambiguous. It is clear that the trial court was primarily concerned with delaying the sentencing hearing. It does not appear that the trial court was prejudging a future motion for a new trial based on ineffective assistance of counsel. In any event, Ortega obtained new counsel on appeal who presented the question to the Court of Appeal and separately complained of ineffective assistance of counsel before the Supreme Court.

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Ortega must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

In support of Ortega's counseled habeas petition in the California Supreme Court, habeas counsel submitted a succinct affidavit from defense counsel indicating that counsel had no strategic or tactical reason for failing to consult with experts or offer their testimony at trial. Habeas counsel also retained Dr. Judy Melinek, a forensic pathologist, and Craig Fries, who created a 3D model of the victim's body that included possible trajectories of the bullets causing the three wounds as described in the autopsy report.[4]  In his Petition before this Court, Ortega states that those experts determined that:

(A)     Based on the forensic evidence presented at trial, Mayes dies from multiple gunshot wounds and there is no way to definitely tell which wou[n]d was first, second or last in sequence.  The prosecution's theory which ascribes a sequence to the wounds, while not inconsistent with the forensic evidence, is not the only or most likely scenario.

(B)     Based upon the bullet trajectory data, Mayes' gunshot wounds could each have resulted from one of multiple possible relative positions of both Ortega and Mayes and the trajectory data could not be used to determine the sequence of shots or to determine that any purported sequence of gunshots could be ruled out or deemed impossible.

(C)     The bullet trajectory disclosed that consistent with the defense theory at trial, it was just as reasonably probable that Mayes was in an ensuing struggle and in an offensive posture during the shooting than a defensive one.  It was also consistent with the evidence that Mayes was shot in the arm first while he Mayes [sic] was trying to punch Ortega.

(D)     The bullet trajectory data also disclosed that it was just as likely that Mayes was standing or lunging when he was shot in the shoulder that it was that he was down on the ground with Ortega above him.

(E)     None of the shots could have immediately incapacitated Mayes and he could have continued to fight throughout the incident as described by witness Sims.

---

[4]     The Petition summarizes the declarations of Dr. Melinek and Mr. Fries, but the declarations themselves are not included in the filing.  The declarations are, however, part of the record before this Court as attachments to the counseled habeas petition filed in the California Supreme Court (Lodged Document 13).

Petition (Docket No. 1) at 33-34 (citations omitted).

In considering this claim on state habeas review, the California Supreme Court denied the Petition without comment, which as discussed above, is an adjudication on the merits and entitled to deference. *Harrington*, 562 U.S. at 99 ("Where a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in absence of any indication or state-law procedural principles to the contrary.").

The Ninth Circuit remains sensitive to the issue of retaining and consulting with defense experts. *See, e.g.*, *Weeden v. Johnson*, 854 F.3d 1063, 1070-71 (9th Cir. 2017) (holding that trial counsel was deficient in failing to seek psychological evaluation about effect of petitioner's youth on her mental state); *Richter v. Hickman*, 578 F.3d 944, 953-54 (9th Cir. 2009) (en banc) (trial counsel's failure to consult an expert in blood evidence constituted ineffective assistance), *rev'd by Harrington v. Richter*, 562 U.S. 86 (2011). The cases finding ineffective assistance based on defense counsel's failure to consult with an expert or offer expert testimony appear to involve situations where the prospective defense expert testimony would: 1) exonerate the defendant; 2) conflict with powerful expert testimony offered by the Government; 3) significantly weaken adverse Government expert testimony; and 4) aid in preparing defense counsel's cross-examination of the adverse Government expert testimony.

Upon independent review, the Court concludes that the California Supreme Court could reasonably have concluded that trial counsel's failure to retain its own forensic expert was either

not error or, if error, did not prejudice Ortega.[5]  According to Ortega, "[h]ad trial counsel called a forensic expert, it is likely that the prosecution's theory that Mr. Ortega premeditated and intentionally killed Mayes would have been shown to be even more lacking in evidentiary support."  But the record shows that the uncertainty regarding the shot sequence and Mayes' position was explored through cross-examination of the testimony of the State's expert, Dr. Super.  For example, the Court of Appeal noted:

> Dr. Super opined that the gunshot wound to Mayes's shoulder was consistent either with Mayes having been bent forward and the shooter firing horizontally into Mayes's shoulder or the shooter being above Mayes.  However, he acknowledged that he *could not determine the sequence in which the gunshot wounds were inflicted, Mayes's exact position during any of the shots, or the time lapse involved in the shots.  He agreed there was "[e]ssentially" "an endless combination" of possible positions of Mayes's body and the gun, and offered as an example that Mayes could have been hanging upside down while the shooter fired upward.*
> . . . .
> Dr. Super testified that he could tell the relationship of the muzzle of the gun and one part of Mayes's body, but that he could not opine with certainty Mayes's specific position when the fatal wound was inflicted.

*Ortega*, 2012 WL 1200930, at *3, 6 (emphasis added).

None of the situations outlined above, where a federal court rejected as unreasonable a state court conclusion that trial counsel's failure to consult or call an expert witness did not violate *Strickland*, are applicable here.  The proposed defense expert testimony could only state that the defense's suggested scenario was just as likely as the prosecution's argued theory of the case; the proposed expert evidence therefore did not exonerate Ortega.  Moreover, because the

---

[5]       In its order, the Supreme Court did not separately address the two prongs of the *Strickland* rule: 1) incompetency and 2) prejudice.  Thus, we must assume that the court alternatively found that counsel's performance was not ineffective *and*, if ineffective, was not prejudicial.  Each potential conclusion must be considered by this Court under the deferential standards discussed in *Harrington*, 562 U.S. at 99, 102.

Government's expert testimony was unable to reach many conclusions, the proposed testimony did not conflict with the Government's expert evidence, which, for the same reasons, was not particularly strong.  Indeed, the proposed testimony is largely cumulative of the Government's expert evidence.  Finally, the record shows that, even without the proposed defense expert testimony, defense counsel was able to deftly and effectively cross-examine the Government's expert and highlight the shortcomings in the Government's expert evidence.  The following exchanges on cross-examination are illustrative:

> Q.    At the time the injury was inflicted, can you tell us whether or not Mr. Mayes was seated or prone in some fashion?
>
> A.    No, I cannot.
>
> Q.    As a matter of fact, you can't tell us at all what position he was in at that time, correct?
>
> A.    That's correct.
>
> Q.    You can just tell us generally speaking and sometimes more precisely the position of the weapon that inflicted the injuries that you tracked in your examination?
>
> A.    Right, I can tell you the relationship between the muzzle of the gun and one part of his body in one instant, which the victim and the assailant may be moving.
>
> Q.    Correct.  So there's an endless combination of positions of gun and Mr. Mayes' body at the time of the infliction of the wound above the shoulder, correct?
>
> A.    Essentially, yes.
>
> Q.    Okay.  Can you tell us in relationship to the wound that was found in his right leg how close the gun was to him at the time that that shot was fire?
>
> A.    No.  That determination requires changes to occur on the skin around that entrance wound, and this is one of those types of entrance wounds that doesn't tell us anything.  It doesn't mean it wasn't close, but there's nothing on the skin that tells us that, so this would be an indeterminate-range-type wound.
>
> Q.    That's as to the wound on the leg?

A.      I think it's all three of them.

Q.      That was going to be my next question.  With what you observed, you can tell us nothing about the proximity of the weapon to the wound?

A.      Yes, when there are changes, we recognize them, and then we do make those assessments, but in this case we can't.

. . . .

Q.      And are you able to tell us based upon your examination, including your examination of the abrasions, whether the abrasions preceded the gun—any or all of the gunshots?

A.      I cannot do that, no.

Q.      It's just something that can't be determined forensically, correct?

A.      No.  They appear to be around the same time frame, but I can't sequence them.

Q.      I mean, it is a possibility that he could have bumped his head a half-hour before this incident, and it would have that same appearance as if he had bumped it at the time of the incident, right?

A.      That's possible, yes.

. . . .

Q.      I asked you this kind of in general terms, but I'm going to ask you more specifically.  Is there any way you can us anything about the sequencing of the shots that struck Mr. Mayes?

A.      No, I cannot.

Q.      Is there anything that you can tell us about the time lapse involved in the shots that struck Mr. Mayes, from first to last?

A.      No, I can't.

While it theoretically may have been helpful to Ortega to have additional evidence on the

uncertainty surrounding Dr. Super's testimony, it is too speculative to believe that there is a

"reasonable probability sufficient to undermine confidence in the outcome" that the jury would

have come to a different conclusion if this now-proffered expert evidence had been presented at trial. *Harrington*, 562 U.S. at 104 ("It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" (quoting *Strickland*, 466 U.S. at 693)). Given the high bar required under *Strickland*, and in light of the deference this Court must afford the state court's decision, Ortega fails to prove that he was prejudiced by counsel's inaction. The U.S. Supreme Court has recently affirmed the deference to be afforded a state court's determination:

> In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 575 U.S. ——, ——, 135 S. Ct. 1372, 1376, 191 L.Ed.2d 464 (2015) (per curiam ) (internal quotation marks omitted). In other words, a litigant must "show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ibid.* (internal quotation marks omitted). This is "meant to be" a difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011).

*Virginia v. LeBlanc*, ___ S. Ct. ___, 2017 WL 2507375, at *3 (2017).

Under these standards, the Court cannot find that the state court's rejection of Ortega's ineffective assistance claim unreasonably applies or contravenes federal law. He is not entitled to relief on his ineffective assistance claim.

## V. CONCLUSION AND ORDER

Ortega is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court grants a Certificate of Appealability solely to his claim that trial counsel was ineffective for failing to obtain forensic expert evidence.

*See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 15, 2017.

   /s/James K. Singleton, Jr.   
JAMES K. SINGLETON, JR.
Senior United States District Judge
